MERCHANTS' & BANKERS' FIRE UNDERWRITERS v. PARKER.    (No. 8451.)

(Court of Civil Appeals of Texas. Ft. Worth. Nov. 4, 1916. Rehearing Denied Dec. 9, 1916.)

1. INSURANCE ⟨key⟩645(3)—ESTOPPEL—PLEADING.

In an action on a fire insurance policy, plaintiff cannot rely on the estoppel of defendant to deny the agency of the one who took plaintiff's application and premium, unless the estoppel is specially pleaded.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1554, 1634–1641; Dec. Dig. ⟨key⟩ 645(3).]

2. INSURANCE ⟨key⟩130(2)—CONTRACT—APPROVAL OF APPLICATION.

Where an application for fire insurance provided that no liability should attach until the application was actually approved by the home office, there can be no recovery where the jury found that the application had not been approved, since until the approval there was no contract, but only a proposal for a contract.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 196, 197; Dec. Dig. ⟨key⟩130(2).]

Error from District Court, Wichita County; E. W. Nicholson, Judge.

Action by I. D. Parker against the Merchants' & Bankers' Fire Underwriters. Judgment for the plaintiff on special issues found by the jury, and defendant brings error. Reversed, and cause remanded.

Thompson, Knight, Baker & Harris and Will C. Thompson, all of Dallas, for appellant. Weeks & Weeks, of Wichita Falls, for appellee.

BUCK, J. The following statement of the nature and result of the suit made by the defendant in error we find to be substantially correct:

"This suit was instituted on November 10, 1914, in the district court of Wichita county, Texas, by I. D. Parker against the Merchants' & Bankers' Fire Underwriters, alleged to be a 'mutual reciprocal fire insurance company, unincorporated, of Bexar County, Texas, of which J. A. Baker & Co. are general attorneys and managers.'

"Plaintiff alleges in substance: That about April 6, 1914, he applied to defendant for a policy of fire insurance in the sum of $700, covering his residence and household goods, in Electra, Wichita county, Texas, for a term of six years at an annual premium of $11.20. That the application was in writing and was delivered to defendant's duly authorized agent, A. J. Adams, together with the first premium, both of which were accepted by defendant and a policy of fire insurance issued to defendant. Plaintiff further alleged: That the original policy had either been lost or was in the possession of defendant. That on May 25, 1914, while the policy was in full force and effect, all the said house and contents were completely destroyed by fire. That such property was then worth $1,250. Then plaintiff further pleaded that he had complied with all the terms and conditions of the policy, made due proof of loss and demanded payment of the insurance, etc., and prayed for judgment for $700.

"By its first amended original answer, defendant denied all the material allegations of plaintiff's petition; denied the agency of A. J. Adams; and further pleaded in defense the following terms of its application: 'And no liability of the association shall attach until this application has been actually approved at the home office of the association.' Defendant denied the receipt of any such insurance application at its home office, and further specially pleaded the failure of plaintiff to make proof of loss. That plaintiff's application was destroyed in his presence and his money refunded by A. J. Adams.

"By a supplemental petition, plaintiff further alleged the agency of Adams, the receipt of the application and premium by defendant, and the acceptance and approval of same, willingness at all times to accept the policy as applied for, that liability attached as soon as defendant approved the application, and pleaded estoppel to defendant's issue in reference to proof of loss.

"The case was tried before a jury on March 25, 1915, and submitted to them on special issues, which together with the answers of the jury are as follows:

"Issue 1: Did or did not the plaintiff sign an application to A. J. Adams, for insurance on his house and household goods in defendant company? Answer yes or no. Answer: 'Yes.'

"Issue 2: If you answer the above issue in the affirmative, then for what amount was plain-

tiff's house and household goods to be insured? Answer: '$700.'

"Issue 3: Was or was not A. J. Adams the agent of defendant company, at the time he solicited insurance from plaintiff, and gave him the receipt and received from plaintiff the check offered in evidence? Answer yes or no. Answer: 'Yes.'

"Issue 4: Did or did not the defendant company ratify the acts of A. J. Adams, in the soliciting of said insurance from plaintiff and in giving said receipt and in receiving said check for first premium, by accepting the application and money for first premium? That is, if he did solicit said insurance and give said receipt and accept said check, if it did accept same. Answer, yes or no. Answer: 'Yes.'

"Issue 5: Did or did not the defendant company receive the application and money for first premium on said insurance? Answer yes or no. Answer: 'Yes.'

"Issue 6: Did or did not the defendant company act on said application and accept and approve same? Answer yes or no. Answer: 'No.'

"Issue 7: Did or did not the defendant company receive and keep the cash premium paid by plaintiff for said insurance? That is, if any cash premium was paid. Answer yes or no. Answer: 'Yes.'

"Issue 8: Did or did not plaintiff, within 91 days after said loss by fire, make proof of the loss of his said house and household goods in compliance with the requirements of the application and policy? Answer yes or no. Answer: 'Yes.'

"Issue 9: Did or did not A. J. Adams destroy said application? Answer yes or no. Answer: 'No.'

"Issue 10: Did or did not A. J. Adams return to plaintiff the money plaintiff paid him for the first premium on said insurance? Answer yes or no. Answer: 'No.'"

On these findings both parties made motion for judgment, the court granting plaintiff's motion, and entering judgment for him in the sum of $644, with interest from March 25, 1915, at 6 per cent. per annum. From this judgment the defendant has prosecuted this writ of error.

The first assignment of error is as follows:

"This honorable court erred in overruling defendant's motion for judgment, because the undisputed evidence showed that A. J. Adams was not the defendant's agent. That the defendant did not approve an application of plaintiff for insurance or contract with plaintiff for insurance."

The second assignment is:

"This honorable court erred in rendering judgment for plaintiff, because the undisputed evidence and the findings of the jury showed that there was no contract of insurance in existence between plaintiff and defendant prior to the fire complained of."

These two assignments will be discussed together.

As will be remembered, the sixth special issue was as follows:

"Did or did not the defendant company act on said application and accept and approve same? Answer yes or no." To which the jury answered: "No."

The defendant, both by pleading and testimony, denied the agency of A. J. Adams, the purported agent who took the application for insurance of the plaintiff. J. A. Baker, who describes himself as "attorney and manager for the Merchants' & Bankers' Fire Underwriters," but who testified that he owned the business, denied that at any time Adams had been employed or authorized to solicit insurance. He testified that Adams had, through him, applied to the commissioner of banking and insurance for a commission to act as an insurance agent for the defendant, but that such application had not been granted by said commissioner, and that Adams was not in fact at any time an agent of defendant company. He further testified that the last time he had heard of Adams, the latter was in Florida. He denied that the company ever received an application for insurance from plaintiff, either through A. J. Adams, or any other person, or had ever received any check or other payment for the first premium on the policy, or that said association or he knew anything about any application having been made, or about any money having been paid thereon, until after the fire occurred. While there is no direct contradiction of this testimony with reference to the employment of Adams by the defendant, yet there is certain testimony constituting a sufficient basis perhaps, especially under a plea of estoppel to deny agency, for the finding of the jury that said Adams was the agent of defendant. The plaintiff testified that Adams approached him several times in the town of Electra, soliciting his insurance, and that finally he gave to said Adams a check, dated April 15, 1914, for $11.20, and signed an application, dated April 6, 1914, for insurance on his residence and household goods in the sum of $700, for a term of six years, the cash payment being the first of six annual premiums. The check was introduced in evidence as having been paid through the local bank, and indorsed on the back "J. A. Baker & Co., per A." He explained the difference between the date of the check and the date of the application was due to the fact that the agent agreed to accept a check dated a few days ahead, as at the time the application was made he was a little short of funds.

W. H. Dallishaw testified that he gave an application for insurance to Adams in March, 1914, and paid Adams by check, and said check was cashed through the bank, and that Adams gave him a receipt similar to that given to plaintiff; that witness signed an application giving a description of the property, said application providing for a premium to be paid in annual installments; that witness, in response to his application, received the policy with the name "Merchants' & Bankers' Fire Underwriters Company" on it.

S. C. Chapman, assistant cashier of the First National Bank of Electra, testified to knowing A. J. Adams since February, 1914, and that he came into the bank with Thomas Tripp "who is represented as the state agent of the Merchants' & Bankers' Fire Underwriters, San Antonio." He further testified to Adams' having an account in the bank, and giving checks on said account, and he identified the signature of Adams on the

check given by the witness Dallishaw. He further testified that Adams had written a policy in the defendant company in April, 1914, for T. D. Walker, a hotel man at Electra, and that Adams had with him while in Electra supplies with the name of defendant company thereon.

John Mann testified to having a policy in the defendant company, the application for which had been given to Adams, and that witness had received a receipt from Adams for the first premium. That he did not receive any policy, and he wrote the defendant company, and that later Mr. Tripp came to see him, and that witness received a policy subsequent to the visit of Mr. Tripp, and that the policy came from San Antonio.

T. C. Tripp testified that he had paid to the company the amount of the first year's premium claimed by the witness Mann to have been paid to Adams, that Mann was a friend of long standing, and that he did not want him to lose anything by reason of the transaction with Adams. He further stated that it was his remembrance that the name "R. F. Stevenson & Co." was signed to the Mann receipt; that he knew R. F. Stevenson, but not "R. F. Stevenson & Co."; that Stevenson was one of defendant's agents living at Proctor, and that he did not recall that said Stevenson had any authority to appoint any agent to help him; that Stevenson was still an agent for the company. The witness further testified that he was with Adams at Electra in February, 1914, and that he (witness) was trying to get Adams a commission from the commissioner of banking and insurance—

"to be our duly authorized agent, but he did not get it. It would seem that he solicited. I knew last December that Adams had solicited, when he was talking to John Mann here in Wichita Falls. I knew that he had no right to solicit without authority. The commissioner of banking and insurance is at Austin. When I was in Electra with Adams I was trying to get him an appointment. I did not get him the appointment. It is customary for a man not to solicit insurance until he gets a permit from the commissioner of insurance. I did not solicit before I got my commission. Adams was assisting me in the securing of business at Electra. I went into the bank with him a number of times. If he collected money and remitted it to the Merchants' & Bankers' Fire Underwriters, I do not know it. I do not remember the T. D. Walker policy. I have no recollection of the Crawford & Menerick policy (taken out by the witness Dallishaw). I do not know anything about Adams' soliciting that business. I do not know anything about any policy being issued. I do not know anything about the policies, but if they were to my account they had my name on the back. I was with Adams some four to six days. I do not remember one he solicited when he was with me. It was some kind of a hotel and burned, and we had to pay for it. I sold that policy myself. I do not remember of him ever soliciting at all. He was with me and I solicited and he listened to me."

He further testified that Stevenson took applications for the appointment of agents, but did not have the power to appoint such agents. That in December, 1914, he saw Adams in Wichita Falls, and knew at the time that he had taken money from John Mann without any authority, and that he (witness) had not personally taken any steps to have said Adams prosecuted. That he had heard from Adams in January, 1915. He further testified:

"I represent the defendant in my limited way in North Texas. Mr. Baker is over me. He is the one who is referred to in the policy form 'J. A. Baker & Co., Attorneys and Managers.' * * * I have looked up the John Mann policy to the Star Furniture Company, and find that the premium of $23.65 was charged to me. My duties with reference to this defendant are to solicit applications, and I never do anything else, unless I have specific instructions from the company. By soliciting I mean that I take an application and go to a man and talk about insurance, tell him what I have done, the company I am with, what price on his risk, what the board rate is, and I fill out the application and have him to sign it, give him a receipt, and send the application to the head office, and, if it is approved, a policy is issued on it, and, if not, it is sent back. Mr. J. A. Baker of San Antonio approves applications. When I give a receipt I sign it as nearly like the commissioner of insurance specifies as I can; my name always appears on every receipt I give. I never sign 'J. A. Baker' per myself; I haven't that authority. Adams and myself were in Electra in the early part of February, 1914, for four, five, or six days. To have had Adams appointed agent I had to have him file an application to the commissioner of insurance and banking at Austin, Tex., stating the men that he had worked for for the last five years; letters of recommendation—everything to show his reputation for five years past, that is the law; you have a form to comply with and I had him fill that out and forward it to Mr. Baker; his duty was to forward that to the commissioner of insurance and banking; the permit would be sent to Baker in order that a man might become our agent; after considerable negotiations the commissioner refused to issue that permit; it was turned down. If Mr. Baker declines a permit, it is done; if it is sent to the commissioner and he declines it, it is done; I cannot pass on things at all; nor can anybody else except those two."

[1] But whether the testimony above set out is sufficient to sustain plaintiff's plea of the agency of Adams, in the absence of a plea of estoppel, which the plaintiff's pleadings do not contain, and which equitable doctrine must be specially pleaded, except in action of trespass to try title (Townes' Texas Pleading [2d Ed.] 543; Scarbrough v. Alcorn, 74 Tex. 358, 12 S. W. 72), we are not called on to decide, for, as we view it, the question presented in appellant's second assignment is decisive.

[2] If the finding of the jury in answer to issue No. 6 be given its natural and proper effect, the other findings become immaterial, and judgment should not have been rendered for the plaintiff. If the defendant company did not accept and approve the application, the contract of insurance was not consummated, and, ordinarily it should be held in such an instance, the insurance company would not be liable for loss accruing, for the application made by plaintiff below provided:

"And the association shall not be bound by any act done, or statement or agreement made, or promise, or knowledge of any solicitor, deputy or other person, which is not contained in this

application, and no liability of the association shall attach until this application has been actually approved at the home office of the association, and the undersigned applicant for the proposed insurance hereby agrees to accept the policy issued by the association upon the application."

See Life Ins. Co. v. Hockett, 35 Ind. App. 89, 73 N. E. 842; Sterling v. W. O. W., 28 Utah, 505, 80 Pac. 375, on rehearing, Id., 28 Utah, 526, 80 Pac. 1110; Walker v. Ins. Co., 51 Iowa, 679, 2 N. W. 583; Cooksey v. Ins. Co., 73 Ark. 117, 83 S. W. 317, 108 Am. St. Rep. 26; Chamberlain v. Ins. Co., 109 Wis. 4, 85 N. W. 128, 83 Am. St. Rep. 851; Ins. Co. v. Rudolph, 45 Tex. 454; Coker v. Atlas Acc. Ins. Co., 31 S. W. 703; Ætna Life Ins. Co. v. Hocker, 39 Tex. Civ. App. 330, 89 S. W. 262.

Cooley in his work entitled "Briefs on the Law of Insurance," vol. 1, p. 412 (c), says:

"The making of an application is, however, merely a step in the creation of a contract. As was said in Lee v. Life Ins. Co., 15 Fed. Cas. 158, the rights of the applicant are not concluded by the making out of the application. When the application is made out and forwarded to the company, it is not yet a contract of insurance. It has then only attained the position of a proposition on one side, which must be accepted on the other. That is to say, until it is accepted by some one having authority to accept the terms proposed, the application is not a contract, but merely a proposal."

In some cases it has been held that where an application has been made and forwarded to the insurance company and retained by it an unreasonable length of time, without action, and the applicant has relied on his protection to his loss, the insurance company is liable. See 1 Cooley on Insurance, supra, 426 (h); Adams v. Eidam, 42 Minn. 53, 43 N. W. 690; Waters v. Security, etc., Co., 144 N. C. 663, 57 S. E. 437, 13 L. R. A. (N. S.) 805; Travelers' Ins. Co. v. Jones, 32 Tex. Civ. App. 146, 73 S. W. 978 (writ of error denied); Cont. Ins. Co. v. Haynes, 10 Ky. Law Rep. 276; Halle v. N. Y. Life Ins. Co. (Ky.) 58 S. W. 822, cited in Ins. Co. v. Neafus, 145 Ky. 563, 140 S. W. 1026, 36 L. R. A. (N. S.) 1211.

But without discussing each of these cases, and others of similar import, separately, it is perhaps sufficient to say that in each case the conclusion reached was based upon a state of facts peculiar to it, and showing an instance of equitable grounds of recovery upon the part of plaintiff by reason of the negligent delays of the defendant. Moreover, the holding in this class of cases is in conflict with the trend of authority throughout this country. Quoting the language used in Life Ins. Co. v. Rudolph, supra:

"It devolved on the plaintiffs to prove, according to their averment, that the contract of insurance had been completed by the acceptance on the part of the company of the application. By the terms of the receipt no insurance was attempted to be created until the application was accepted. Mr. Parsons, in treating the subject, says: 'It would seem that a policy may take effect if the bargain be completely made, although, before any delivery of it, the one insured has died, and delivery was withheld in

consequence. It need not be added that the evidence must be very clear and the circumstances very strong to give effect to such a policy.' "

In the case of Preferred Acc. Ins. Co. v. Stone, 61 Kan. 48, 58 Pac. 986, the Supreme Court of Kansas announces, we think, the true doctrine, where it, in effect, says when a contract of insurance has been agreed upon, the execution of a policy is not essential to its taking effect, unless part of the contract be that it shall not take effect until the execution and delivery of that instrument; and, except in such cases, the insured may bring suit upon the agreement before the issuance of the policy, if a loss has occurred in the meantime, and may also join in the suit a cause of action in equity for the specific performance of the contract to issue a policy. Of course, no such condition exists in the instant case but, on the contrary, the application provided that the contract of insurance should not take effect until the application had been approved by the home office.

We conclude that the trial court erred in rendering judgment for plaintiff, in the face of the jury's finding to special issue No. 6, for which error the judgment must be reversed.

Judgment reversed, and cause remanded.

---

⊙=For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes